FILED
2026 May-01 AM 11:46
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

4:23-cr-00383-CLM-NAD-8

UNITED STATES OF AMERICA,
Plaintiff,
vs.

CK CHIKONG TRAN,
Defendant.

---

OFFICIAL TRANSCRIPT OF SENTENCING HEARING
ANNISTON, ALABAMA
APRIL 16, 2026

BEFORE THE HONORABLE COREY L. MAZE
UNITED STATES DISTRICT JUDGE

FOR THE UNITED STATES:
JOHN HUNDSCHEID
U.S. Attorney's Office
400 Meridian Street
Suite 304
Huntsville, Alabama 35801

FOR THE DEFENDANT:
ALISON WALLACE
Attorney at Law
P.O.Box 36926
Hoover, Alabama 35236

U.S. PROBATION OFFICER JENNIFER DUPUY

COURT REPORTER:
Carrie M. Robinson, RMR, CRR, CRI
Federal Official Court Reporter
1729 Fifth Avenue North
Birmingham, Alabama 35203
(205)278-2063

(Proceedings recorded by mechanical stenography. Transcript produced by computer-aided transcription.)

P R O C E E D I N G S

April 16, 2026 1:53 p.m.

THE COURT: This is Case Number 4:23-383, United States versus CK Tran. Mr. Tran is here with us today.

Who is here on behalf of Mr. Tran?

MS. WALLACE: Alison Wallace for Mr. Tran.

THE COURT: And who is here for the government?

MR. HUNDSCHEID: John Hundscheid for the United States, Your Honor.

THE COURT: All right. Good afternoon to you-all.

So this is one of our six sentencing hearings today on the conspiracy case involving the Noir Organization refund fraud scheme. I have considered lots of documents and other things in considering today's case, so let me run through them before we get started.

In compliance with Booker, I have read and considered the sentencing guidelines and taken them into account on the issue of the appropriate sentencing guideline range. In that regard, I note that Mr. Tran in his plea agreement waived any right for a jury to determine the facts of his case in accordance with Booker and he admitted certain facts that bear upon the computation of his offense level under the guidelines.

I have also read the PSR, Ms. Wallace's objection to the PSR, the government's omnibus sentencing memo, the

government's updated calculation of the offense levels, and I discussed the updated calculation with all attorneys on the record yesterday. I have read Ms. Wallace's sentencing memo and the letter from Mr. Tran's brother in preparation for today.

Ms. Wallace, did you have at least 35 days in which to review the presentence report?

MS. WALLACE: We have, Your Honor.

THE COURT: Very good. Obviously, you did file objections. The objections I had, at least in your initial document, are the calculation of the time range of Mr. Tran's participation and, based on what we decide on the time range, whether or not there were ten or more victims related during that range.

I do understand that you and Mr. Tran have other objections that you would like to orally make today, correct, Ms. Wallace?

MS. WALLACE: That is correct, Your Honor.

We would also like to object to the sophisticated means -- the two-point enhancement for the sophisticated means.

THE COURT: Very good. So here is how we are going to do it today: Rather than just do it, like, objection by objection like normal, I am going to walk through how we calculate the offense level in this case. And as we go to

each one, I will just ask you whether you object or not. And if you do, I will let you state the objection. And I will let the government respond, and then I will make a ruling on each one, including the three that we have mentioned.

Before we do that, I want Mr. Hundscheid to go first because, at least in the written form -- and I know we are going to get into sophisticated means too, so I want you to include that -- but I want you to give me an overview of the evidence in the record about the start date of Mr. Tran's involvement with either Noir or Noir's Organization and the specific involvement that he had, including what means, because you know that we are headed toward sophisticated means, what specific actions that Mr. Tran took that you believe, sort of, roped him in with Noir's Organization and would be allowable to consider as a sophisticated mean that was used as part of the organization.

MR. HUNDSCHEID: Yes, Your Honor. I will start with just a brief overview of the methodology of how the loss amount was calculated.

THE COURT: Okay.

MR. HUNDSCHEID: As the Court is aware, there are order sheets that are referenced in the plea agreements that are stored both in Google Drives and then a project management tool called ClickUp. Those were recovered from conspirators' accounts through a search warrant. The FBI did analyze that

data and built a spreadsheet which is essentially a summary of all the orders that are reflected in those documents.

In my view, it is an incredibly conservative estimate because it is gravitated towards December of 2021, and so we are capturing a snapshot in time of the loss amount, really, and not a true reflection. So I think that methodology is a conservative estimate that the Court could be comfortable on relying on for purposes of the guideline calculation here.

So those losses show about 1.1 million from the Google Sheets and about 600,000 from ClickUp. Roughly speaking, August of 2021 is where the Google Sheets start, and then they end in February of 2022 at which point the ClickUp orders pick up for the next few months.

THE COURT: What was the start date for Google?

MR. HUNDSCHEID: I can -- if you will give me one second, Your Honor, I will tell you the exact date it is, but I believe it is in August of 2021.

THE COURT: Okay.

(Brief pause)

MR. HUNDSCHEID: It is August 21st, 2021.

THE COURT: Okay. All right. The reason I want to start here is the PSR has Mr. Tran's involvement starting in November of '22. And Ms. Wallace's memo I think had it later into 2022. But your omnibus motion, the one that I am making

my notes on, indicates that you have evidence that it was as early as March of 2020. So go through with me what evidence you say indicates that Mr. Tran was connected to Noir's Organization before August of 2021 when the calculation of the loss occurred -- starts.

MR. HUNDSCHEID: Yes, Your Honor. So as the Court referenced in the sentencing memo the government has filed, there are Telegram chats that came from a consensual search of Mr. Tran's Telegram account following his arrest which I think is the subject of, perhaps, the confusion about when the start dates started because a review of those materials show that the relationship was even longer back than was initially thought through the preindictment investigation.

So what is contained on page 16 of the government's sentencing memo are screenshots from that Telegram chat. Telegram is, unfortunately, not a very friendly platform to work with, so the FBI computer scientist wrote a SQLite database that pulls the messages out in this format. And what you see in that first message on the top of page 16 is a series of messages in late -- mid to late March, 2020, where the user Radiant, who is Mr. Tran, is representing himself out as an admin of a Noir chat and also an admin of other chats like AIO, which -- and some other groups, Your Honor.

And then in that second message -- or, again, around the same time of March of 2020, you see Mr. Tran tell another

user Noir -- Noir referred you to me because I am looking for a drop service and we also work together.

So, again, that shows that partnership as far back as 2020 as well.

Finally, one more from early March of 2020, you can see somebody messaging to the Radiant account saying, I have reached out to Noir a few days ago, and I am still waiting on the 50 percent partial refund. I wasn't too sure if I should message an admin to get help or not.

So I think all of that shows that Mr. Tran is involved with Noir as far back as March 2020 to the point of if users are having issues with a refund, they are reaching out to him and identifying him as an administrator of the channel.

So given that relationship, I think it is safe to attribute all of the losses that the government has been able to establish here from that August 2021 into the spring of 2022 because we can show that Mr. Tran's relationship with Noir predates even the charged conspiracy in the indictment, Your Honor, and actually extends back further than that.

THE COURT: All right. Before you sit down, Mr. Jones, I am going to need you to leave for about two minutes.

Sam, I will just tell you to go get him.

MR. JONES: Yes, sir.

(Courtroom cleared)

THE COURT: All right. For record purposes, the reason I did that was to ensure that the only persons in the room are related to this case or court personnel.

I also know from reading the government's 5K motion that Mr. Tran was instrumental in identifying and locating Noir himself. If you could, go through the evidence that was received by the government from Mr. Tran regarding Mr. Noir and their relationship.

MR. HUNDSCHEID: Yes, Your Honor. Mr. Tran was, as the Court said, instrumental in finding Noir. We wouldn't have done that and indicted him without the information that he provided. And that comes from the relationship that Mr. Tran had with Noir that was different than other people that are involved in this case. They gave us good leads. Specifically, Mr. Tran had interacted with him on platforms other than Telegram, which is critical for an investigation like this because at that time, Telegram was not responsive to law enforcement requests. And so the best -- somebody who is cooperating who can talk to Noir on Telegram, that doesn't get us anything as investigators into attributing that account to a particular person.

But Mr. Tran identified on his own volition when we explained what we were looking for two specific facilities that Mr. Noir -- Mr. Noir -- Mr. Ahmad, Noir, used,

specifically a Steam account that he had interacted -- that Mr. Tran had interacted with Noir on and then also a Snapchat account.

So legal process was issued for both of those facilities. When we got the search -- when we got a -- I think it was a 2703(d) order back on the Snapchat account, the registered email was an email we had seen in this investigation that had touched the spreadsheets which led us to know that what Mr. Tran was saying was truthful and reliable because we confirmed it through a another mechanism.

THE COURT: How far back do those communications on Steam and Snapchat go, and do any of them have anything to do with refund fraud?

MR. HUNDSCHEID: No, Your Honor. They don't have anything to do with refund fraud. There is no way to really know based on what was left in the account. So we are very, very fortunate because in the spring of 2023, the Steam account was deleted, which I have theories about why that might have been, but -- so there were very limited records that were available to it. But there were a series of email addresses that had been used on the account before. And because there's a level of separation between a Steam account that Noir used to play games with Mr. Tran rather than commit fraud, there's less operational security that's tied to there.

And so there's an email account that's tied to that

Steam account which we were able to pivot off and then identify personal accounts related to Noir.

THE COURT: All right. Before I move on to Ms. Wallace, what contributions did Mr. Tran make to Noir's Organization separate and apart what he did for himself? In other words, not looking at Radiant's Refunds but looking specifically at Noir's Organization, what did he do and what method did he use to do it on behalf of Noir?

MR. HUNDSCHEID: Yes, Your Honor. I wish -- if I were aware that we were arguing sophisticated means, I would have spent more time in the chats and identified --

THE COURT: Well, I am sure they are going to have a lot to say and you can look into it.

MR. HUNDSCHEID: Yes, Your Honor. But the specific one that, I assume from what Mr. Tran handed me, we are going to talk about is that he was providing advice on which refund fraud methods work and don't work. And so on page 6 of the government's omnibus sentencing memo, you can see the user Radiant providing advice about Apple's fraud detection prevention systems and how they work and indicating that he is testing them and is providing that information.

I would say that that is illustrative of Radiant's contributions to these chats. He is a consultant and somebody who would distinguish himself from the workers.

So he is not a refunder. He is an ideas guy or a

bigger-picture person, and he's providing information like this. Like, this particular technique works, or this particular technique doesn't work, or this is what the retailers do or don't do to combat these fraud techniques.

So I think the chat that's screenshotted on page 6 is a good representation of the other, sort of, conduct that is in the chat.

THE COURT: Very good.

All right. Ms. Wallace, again, base offense level is 7. That's not contested. The first thing that is contested is the loss amount attributable to Mr. Tran under 2B1.1(b)(1) being 1.69 million. And the reason that that is contested is your disagreement with Mr. Hundscheid as to the appropriate range of time.

He says that -- Mr. Hundscheid, for the government, says that Mr. Tran should be attributed the time period -- the full time period of the loss which is August of '21 through the end of the Clickup, which is in 2022. And you would argue instead: What is the appropriate time to start Mr. Tran's involvement and why?

MS. WALLACE: Well, Your Honor, I know you have read my sentencing memorandum that gives my dates, and I think Mr. Tran would like to address the Court on that, if that's all right with the Court.

THE COURT: Yes, that's fine, Mr. Tran. And the

place to start is going to be with the Telegram messages that Mr. Hundscheid points out which would indicate that on Telegram, as early as March of 2020, you were holding yourself out to others as being an admin of Noir's chat and Noir's market. So if this is true, that these are your Telegram messages and you are holding yourself out to be an admin of Noir's market, what would the argument be that you are not coordinating with Noir before August of '21?

THE DEFENDANT: Hi, Your Honor. I would like to explain that.

THE COURT: Okay.

THE DEFENDANT: And before I do, I thought I would also need to further give more context as to why I put it on Telegram in the first place because it is in direct relation to everything else.

THE COURT: Okay.

THE DEFENDANT: So in terms of --

THE COURT: Can you -- before you -- can you pull the microphone up?

THE DEFENDANT: Yeah, okay.

THE COURT: There you go.

THE DEFENDANT: It should be noted that this started around the beginning of COVID, so around, like, between January and March of 2020. And if you were to look at Exhibit C, this -- it would contain chat logs between me and

this person that I was in a long-term relationship with where she pretended to be a human trafficking victim to steal from me. And so that defines my motivation in terms of why I needed to, like, find a way to come up with the finances to help her.

And if you were to look in one of the screenshots, more like several of them, you would see that the timing of those messages would be either on January or March of 2020.

THE COURT: Of which year, 2020?

THE DEFENDANT: Yes, correct.

THE COURT: Okay.

THE DEFENDANT: Around that time frame.

So the reason why I am noting this is because it defines my motivation in terms of how I appeared on Telegram in the first place.

THE COURT: Okay.

THE DEFENDANT: So after that fact, of me actually appearing on Telegram, I -- what I did was I established myself in a chat room, and eventually, that led to me being an admin across multiple groups.

THE COURT: Well, why is she saying that you owe her money?

THE DEFENDANT: That is not -- I did not owe her money. I believe she might have just, like, typed something wrong. But, overall, essentially, she -- the narrative was

that she was being human-trafficked, and she wanted my help.

And so that was my motivation in terms of trying to find finances to achieve that purpose.

THE COURT: So it says, It looks like you are done with her. She is in good hands. Once her debt is cleared, we will send her back to the U.S. When she is back, you can ask her.

THE DEFENDANT: Correct, yes. So that message was someone on her account pretending to speak on her behalf, or it was her posing as a captor reaching out to me or responding to me.

THE COURT: Okay. All right. Go ahead.

THE DEFENDANT: Okay. Yeah.

So in terms of my role on Telegram, because I -- because I spent my time just casually communicating in these groups and just, like, building her persona, I -- eventually, I became one of, like, quote, unquote "super-admins" on the platform, meaning I had access to banning over 50 -- like, banning users in over 50 groups just by, like, one command on the Telegram platform itself.

And so this can be seen in Exhibit D which -- in which I had access to an admin group chat where I -- where I use it to, like, ban users.

And yeah, so basically, the reason why I bring this up is because it is in relation to my comment about me being

an admin in Noir's group. And if you were to pay attention to each and every one of those messages, I don't only name Noir's group. I name several that I was an admin of, but not limited to them.

THE COURT: Well, let me ask you: Have you got that page in front of you?

THE DEFENDANT: Yeah.

THE COURT: That page 16?

Look at the bottom one. It says, Hey, Radiant. I reached out to Noir a few days ago. Still waiting on the 50 percent partial refund. I wasn't too sure if I should message an admin to get help or not.

THE DEFENDANT: Uh-huh, yeah.

THE COURT: And then I am assuming that is your response: I checked your case?

THE DEFENDANT: So what I am bringing up is actually regarding the top of page 16 in which I name --

THE COURT: Yes, but I want you to answer the bottom.

THE DEFENDANT: Oh, okay. Got it. So --

THE COURT: It says, I checked your case, and you messaged Noir five hours after the 24 hours, so you are not applicable for a refund.

THE DEFENDANT: Yes. Please give me, like, one minute -- just a few seconds while I find the reference for

this.

THE COURT: That's fine.

(Brief pause)

THE DEFENDANT: Yeah, so if you were to look on Exhibit G, this would be the full chat log of the conversation itself. And given the context of the full chat log, I was -- it explicitly shows that I was not actually -- I was not actually working for Noir, nor was I handling his refund customers.

THE COURT: Then why would you say you checked his case; he messaged five hours after the 24 hours, so you are not applicable?

THE DEFENDANT: Right.

THE COURT: Why would he be coming to you about a 50 percent partial refund and you checking the case and determining he is not eligible?

THE DEFENDANT: Yeah, so that would be -- so it is important to pay attention to the context of the chat log itself.

THE COURT: Well, I want to pay specific attention to this conversation.

THE DEFENDANT: Okay.

THE COURT: Someone reaches out and asks you why he hasn't gotten the 50 percent refund. The first question is: Why would you be getting asked why Noir isn't giving a refund?

Why does that person think that you are the person to ask?

THE DEFENDANT: Okay. Yeah. So that would be in direct relation to the fact that I am an admin in multiple groups. So he was coming to me to file a scam report on Noir, basically. And then, essentially, I wasn't really aware of the situation, as the chat log indicated. And based off of the message that the user sent me, that's what I forwarded to him and showing him, like, based off of what Noir said that the case, in his situation, would not -- he wouldn't be able to get a refund because of that. And I did tell him to just take it up with Noir himself because I actually had no idea what the situation was. And it just didn't have anything to do with me at all either.

THE COURT: Okay.

THE DEFENDANT: And that is explicitly stated at the top of the messages in the chat log.

THE COURT: All right. Go ahead.

THE DEFENDANT: Yeah, so just going back to the top of page 16 in terms of where I named myself an admin, I did name myself an admin of multiple groups in each and every one of those messages, so the -- but the point I'm making is that, given the full context of those messages, I was not actually stating that in order to, like, you know -- so the reason behind I -- I made those messages was to actually promote my own refund service at that time, around March 2020. And so --

THE COURT: What was your group doing?

THE DEFENDANT: Around that March 2020 time, I had my own refund service.

THE COURT: Okay.

THE DEFENDANT: Which was separate from Noir's, completely unrelated to it.

THE COURT: But you were an admin of Noir's?

THE DEFENDANT: Yeah, I was an admin with Noir's group, along with many other groups.

THE COURT: Okay.

THE DEFENDANT: Either -- like, unrelated to refunds, and there were a couple of various different group types, being like trading, crypto services, and just many different categories.

THE COURT: Okay.

THE DEFENDANT: Okay. So in the middle of the message in which I state that Noir and I work together, I actually stated that in a different context.

THE COURT: What page and exhibit are you on?

THE DEFENDANT: So the exhibit for this would be on Exhibit F.

THE COURT: Okay.

THE DEFENDANT: And given the full context of the chat log, I was actually asking for a job service, and it was actually something that another Telegram user wanted me to

source information for him, and that's what I did. And I just felt that because he was Noir's referral, if I just stated that directly, it would just, like, clear up the confusion and just get to the point.

As you can see through the chat log, nothing actually came out of that conversation, and I just didn't want anything to do with it. So I just like got rid of the conversation with him from that point on.

THE COURT: Okay.

THE DEFENDANT: And so it did not signify anything of me actually working for Noir, nor does it really show any type of business agreement that we had, nothing of that sort.

Now, in terms of my relationship with Noir himself and my -- and the scope of my involvement, to start off, Noir and I were just friends on a personal level, and I was detached from him in terms of any type of, like, business relationships because I just simply did not like his business acumen at all, and that can actually be shown in further chat logs down the road.

But overall, when it comes to the dynamic that Noir and I had in terms of me being affiliated with his groups on Telegram, basically he had a pattern of just repeatedly dropping me in them without my consent, and I -- and this could be seen in Exhibit G where Noir -- where a chat log is shown. And this was in the group Telegrams, or something Chat

Box, something -- that was probably the group name, but basically, Noir -- you can see that Noir tagged me and says, like, Trolololol, and then I respond by calling him an expletive and saying that he dropped me in the groups again, essentially.

And so basically that interaction will show that he did things just to annoy me for fun, and I simply did not like it nor did I expect it. But nonetheless, I did remain in those groups, though.

But in reference to that, my activity in those groups has always been strictly limited because I was not part of operations, and I did not actually say anything unless Noir asked. And during those moments where he would ask, it would always be about me just giving him very general feedback in terms of what I did notice or have seen.

And so in those moments, I would give him mainly just criticisms about his business and, like, his business acumen and why things were not working, and they were not -- they weren't, like, directed marketing advice or anything of that sort. It is more of criticism in nature.

THE COURT: Did you ever stop to think that when you were criticizing and helping him understand why he was performing less than optimal that you were helping someone commit a crime? I mean, you had to know that this was refund fraud and it was criminal and you were helping someone --

conspiring with someone to commit criminal conduct.

THE DEFENDANT: During those moments when he asked me for business advice, it was more about just, like, what was the best way to actually find leads and stuff.

THE COURT: But that doesn't change my question. He's asking you, How can I find leads to commit criminal conduct? I know that you, personally, Mr. Tran, or Radiant, are committing criminal refund fraud. How can I commit criminal refund fraud better?

You had to understand that's what was going on.

THE DEFENDANT: So I can answer that in two parts. So --

THE COURT: Well, the first question is yes or no. Did you understand that you were committing criminal refund fraud and assisting someone else to do the same thing better?

THE DEFENDANT: I would say that in those moments when he asked me those questions, I gave him criticisms knowing that he was committing refund fraud, but in terms of the way that I actually structured my responses to him as such, it was not to actually help him actually carry out his plans but rather just, like, criticize his business acumen in terms of the way that he did run his businesses.

Outside of Telegram -- I don't have the chat logs anymore, but there was a point where Noir actually opened a Shopify account to create a legitimate business for

e-commerce. And at some point, he wanted me to mentor him for that. However, he decided that it was not a profitable venture for him, and he just wanted to just continue his ventures on Telegram. And my relationship with him in terms of my dislike for his business acumen is actually shown across -- I am showing exhibits that demonstrate that.

THE COURT: Okay.

THE DEFENDANT: So in terms of me criticizing his business acumen in general, it covers both fronts. When I did not like his -- the direction that he took, being I preferred him to stay off of Telegram, but in spite of that, based off of his actual business acumen on Telegram, it was not something that was -- that was something sufficient in order to create happy customers as a general business principle, and that's something that I did let him know.

THE COURT: Explain to me Exhibit E.

THE DEFENDANT: Please give me a second while I find that.

THE COURT: It is the one about Walmart pickup fraud. You are -- at this point in March of 2020, you have posted Radiant's Elite Refund Service, up to $15,000 order limits, and someone is asking you about Walmart refunds.

THE DEFENDANT: Give me a second, please.

THE COURT: That's fine. It looks like this (indicating).

THE DEFENDANT: Oh, okay.

(Brief pause)

THE DEFENDANT: Right, okay. So that exhibit was actually one of the chat logs that was used in the government's sentencing memorandum, and the full chat log of that is basically me advertising my own refund service and leveraging the fact that I was an admin in multiple different types of groups to achieve that purpose.

THE COURT: Yeah. You were using your connection with Noir, AIO, Moonlight, and KiKi to say, I am legit, because he had accused you of being a scammer before that. And you are like, I can't be a scammer because I am an admin of four of the biggest groups. That is the context of what Mr. Hundscheid was pointing out.

THE DEFENDANT: So it does not explicitly point out that I worked with Noir or had any type of business relationship with Noir. What it does show is that I was an admin of multiple groups in which I leveraged -- I leveraged that reputation to secure business for myself.

THE COURT: Okay. At the end of these messages, you tell him to check your vouches if you want assurance. He says, Send me your group. And one of the four links that you give him is NoirThePlug.

Explain to me why you have an account within Noir called NoirThePlug.

THE DEFENDANT: Can you repeat the question?

THE COURT: Yeah. You can see at the end when this person says, Send me your group, you are trying to give yourself creditability.

THE DEFENDANT: Okay.

THE COURT: He says, Send me your group, and the fourth of the links that you send is tagged at the end "NoirTheplug," which to me indicates that you have a Noir account called "ThePlug."

THE DEFENDANT: No. So NoirThePlug is actually Noir's own account. So basically what a vouch meant on Telegram is that -- it is such that if you are not a person that is -- if you are not a scammer on Telegram, meaning like you offer a service and you fulfill that service, then you are not a scammer, and therefore, you would be vouched for carrying out a service.

THE COURT: Okay.

THE DEFENDANT: So a vouch does not really represent any type of, like, partnership with any type of user. It is just -- it just points out that this person offers a legitimate service, and he won't run away with your money. That's what it means.

THE COURT: But you are doing that by linking yourself to Noir. The evidence that you are giving this person that you are legitimate and not a scammer is by saying

that I am connected to Noir.

THE DEFENDANT: During that time when it comes to --

THE COURT: Well, before "during that time," did what I say -- is what I am saying correct, that when pushed to show that you are a legitimate refund service, you say, Click NoirThePlug to see that I am connected to Noir which is a legitimate, recognized refund service?

THE DEFENDANT: No. So NoirThePlug was actually just an account. It is not a -- NoirThePlug, it was just an individualized Telegram account that Noir had.

THE COURT: For whom?

THE DEFENDANT: Noir himself owned several Telegram accounts, and that was one of them.

THE COURT: So if this person clicked it, what would he or she see?

THE DEFENDANT: He would have seen a -- some type of channel and then, like, a list of, like, users that were quote, unquote, "vouched."

THE COURT: Including yourself?

THE DEFENDANT: Yes. And that vouch list would be sourced from different Telegram groups as well because they just copy each other in terms of the term ring, which people -- which people would have legitimate services that they wouldn't run away with.

THE COURT: So you are using Noir as a vouching

service for you because Noir lists you as someone that it is giving credibility to as a refund service.

THE DEFENDANT: When it comes to vouches on Telegram, when you are vouched in one group, a user can take that and also list you as a vouch in multiple groups. So when it comes to vouches, it does not signify any type of business partnership. It is just a determinant that this person is in this group, and he does not run away with people's money.

That's all it stands for, and it doesn't -- it doesn't signify any type of, like, business agreement nor any type of, like, financial benefit to Noir himself.

This vouch system is actually a very common thing on Telegram across groups, and the way that I used it was to show that I had vouches across multiple groups because I was an admin with them. And on top of the fact that I was an admin, I was not going to just run away with people's money. That's what that -- the chat log shows.

THE COURT: Who made the decision to make you an admin of Noir's group?

THE DEFENDANT: When it comes to that decision, Noir made that decision himself.

THE COURT: Why?

THE DEFENDANT: He -- that is a little bit hard to answer because --

THE COURT: Why do you think?

THE DEFENDANT: Yeah, so Noir and I made each other admins in each other's groups even if they were not -- even if they were unrelated to anything that was fraudulently related.

For instance, I own a stock channel on Telegram, and I also made Noir an admin in there. And Noir actually had a history of just making random friends admins in his groups, and I was not the only one of them.

And when it comes to his groups, I actually have highly limited messages -- message volume, so it -- there's no actual bearing in terms of my business relationship with Noir based on admin status.

THE COURT: When was the first time that he ever asked you for your advice on how to provide a refund service?

THE DEFENDANT: This would be found on -- can you give me a second while I reference my documents?

THE COURT: Uh-huh.

(Brief pause)

THE DEFENDANT: The first notion of this would be found on February 4th.

THE COURT: Y'all can get Mr. Jones back. I forgot -- go ahead.

THE DEFENDANT: This will be shown on -- give me a second.

I have the exhibit for this. I just need to reference it properly.

So this would be found on Exhibit B. You can see that I expressed what does not work for Apple refunds on February 4th, 2022, and what may work for Samsung on March 30th, 2020.

And then --

THE COURT: Let's start over. All right. So it starts March 30th, 2022, on the back. So what is on the front page? The February 4th?

THE DEFENDANT: Yeah. So February 4th is in regards to Apple, the retailer Apple.

THE COURT: Okay.

THE DEFENDANT: And then on March 30th, that was in reference to Samsung. And so the way that I -- the way that I made these comments was in very casual conversation, but I fully accept responsibility that I should not have been in these groups, for one thing. And, secondly, I should not be saying anything in regards to any type of, like, methodology at all when it comes to refunding retailers.

THE COURT: And I know this isn't going to make sense to you, Mr. Tran, but I am going to ask Tori, if she's listening, to print off and bring me a copy of the plea agreement.

All right. Go ahead.

THE DEFENDANT: I also want to make it clear that when --

THE COURT: So you say -- before you go any further, you would say this is the first time that you ever gave Noir advice about some of the problems -- or gave him advice on how to make his organization better?

THE DEFENDANT: This was the first time in which I explicitly -- sorry, explicitly state anything that would actually be a determinant when it comes to possibly, like, helping Noir make refunds in any context.

So it's -- I believe that these messages were very objective in the manner in which I sent them because I should not have sent them in the first place, and it's -- they were very direct statements that I made in which would help -- help the Noir -- Noir's Organization, like, carry out their refund service in some shape or form.

But in terms of really determining the consequences of what I said or, like, the results from that, you can reference Exhibit A, which is the bottom of the Excel sheet, and you can see that from February 4th and March 30th, they did not -- they didn't conduct any successful refunds to the Apple or Samsung retailers. And the reason why I am bringing this up is because in relation to the comments that I made, there were no -- there were no financial benefits to Noir's Organization at all, and they did not carry out any type of activity based off of what I said.

Yeah, so on the order sheet, it typically lists the

date, the name, the account details, and the retailer information and the shipping status.

So from February -- from February 4th, 2022, onwards to the end of the Excel sheet, you can see that there was no actual results that came out of what I said.

THE COURT: Still, you are not convicted of success. You are convicted of conspiring to give them advice.

THE DEFENDANT: Yes, I fully understand this. I am just pointing out that what I said had no actual results on the organization itself.

THE COURT: Okay.

THE DEFENDANT: And that has always been the case in which Noir actually also -- there was a point where Noir actually stated that the information I gave him was not helpful and that, you know -- and that the things I would tell him usually would just be very negative and just -- yeah.

So if you will allow me to bring this up, so basically on Exhibit H --

THE COURT: Okay.

THE DEFENDANT: -- this is where Noir explicitly states that I never respond positively to what he does, and this will show that I lack the proper operational advice I could give him. And it can be seen explicitly in the chat log that he decided that he would need to come up with extra methods himself.

At some point in the chat log, he also states that my knowledge of his operations were also very outdated, and it also shows that further communications down that chat log of Exhibit G -- sorry, Exhibit H, it shows that I also gave him feedback on something that was also just recently released which also would lack results to actually determine how successful it was.

So, essentially, I lacked understanding of their operations in the first place, and Noir asked me to comment something that I didn't know about. But, nonetheless, because he asked me to comment, that's why I said the things that I did.

Yeah, so further down that chat log, which would be referenced in Exhibit I, it's Noir -- that chat log shows that Noir was -- Noir already had a system and plan in place, and he also names his operational partners that would be affiliated -- sorry -- affiliated with that in order to carry out the refund service, and I am not named at all.

THE COURT: Well, let me go back to the beginning, though. Who all was in this chat? It is obviously you, Noir, at least one other person who ultimately deleted the account before you --

THE DEFENDANT: Yeah.

THE COURT: -- printed this off and a person named Reign.

THE DEFENDANT: Right. So that chat log is -- the name of that group chat is Anime Fan Club Chat, and basically, it contained all the operational partners of Noir's Organization -- his workers, his marketers.

THE COURT: What was the name of it again?

THE DEFENDANT: Anime Fan Club Chat.

THE COURT: Spell that for me.

THE DEFENDANT: A-n-i-m-e.

THE COURT: Oh, Anime. Okay.

THE DEFENDANT: Yeah, Anime and then Fan Club Chat.

THE COURT: Okay. And you said this was all of the organizers of the Noir organization.

THE DEFENDANT: Yeah. Those were all the individuals that was part of Noir's Organization.

THE COURT: Why are you added to it?

THE DEFENDANT: Yeah, as mentioned prior, because Noir and I just had a distinctive personal relationship outside business, he just decided to just add me to his groups, despite me not wanting to be there.

THE COURT: But you are weighing in. You don't say, I don't want to be here. You are going back and forth with him about why his ideas are incorrect.

THE DEFENDANT: Correct, yes. So when it comes to the way that I was in groups, I did have -- I did initially leave them repeatedly, but then I was always just added back.

And so eventually there was just no point in leaving because I would just repeatedly be added back in the group. And this was just something that Noir did for fun. And so I -- I accept full responsibility of just talking in these groups when I should not have because I understand that I should not have been in there in the first place, and so -- yeah.

THE COURT: When do you remember first being added to his chat group of organizers that came up with ideas on new or better ways to commit refund fraud?

THE DEFENDANT: This was mostly -- sorry. Just give me a second, please.

MR. HUNDSCHEID: Your Honor, the chats start, that we have, at January 26th of 2022.

THE COURT: Okay.

MR. HUNDSCHEID: That's not to say there aren't previous chats, but what we have --

THE COURT: But it is the ones that you have.

MR. HUNDSCHEID: Yes.

(Brief pause)

THE DEFENDANT: The most notable chat log that I was in is exactly that, the Anime Fan Club Chat. And I believe that chat starts on January 31st, 2022.

THE COURT: Well, I mean, Exhibit H starts on January the 3rd, so it is certainly before January 31st.

THE DEFENDANT: Exhibit H.

THE COURT: The one that you just showed me. The very top says that Radiant responded to Noir on January 3rd, 2022, at 7:43 p.m.

MR. HUNDSCHEID: I think that is a quote of a previous message.

THE COURT: So it is even --

MR. HUNDSCHEID: So it is later.

THE COURT: Okay.

MR. HUNDSCHEID: But it is referencing a previous --

THE COURT: But it shows that he was at least part of a discussion with Noir --

MR. HUNDSCHEID: Yes.

THE COURT: -- as early as January 3rd.

MR. HUNDSCHEID: Yes. I was just clarifying when I said January 26th --

THE COURT: Understood.

MR. HUNDSCHEID: -- that's when this starts.

THE COURT: That's when this one starts.

MR. HUNDSCHEID: Yes.

THE COURT: Okay. All right. You can continue.

THE DEFENDANT: Yeah, so I never actually gave Noir any type of practical advice before the Anime Fan Club Chat. And the Anime Fan Club Chat is where I explicitly talk about the Apple and Samsung refund services.

THE COURT: Okay.

THE DEFENDANT: And other than that, it has always been just very casual conversation that were just criticisms of Noir's business acumen, and that generally has always been the case in terms of my relationship with Noir and his businesses.

So outside of Telegram, that's the actual relationship that I had with Noir which actually allowed me to play games with him on other platforms outside of Telegram, and that's how it always was.

But in terms of business, I did not like his business acumen. He always dropped me in the groups, and I eventually -- I just overstayed my welcome, and I ended up saying things I should not have.

THE COURT: Let me ask you this, Mr. Hundscheid: If I gave you more time, do you have any chats -- Mr. Tran's point about the March 2020 is he wasn't conspiring with Noir to further the conspiracy of Noir making money; he's puffing himself up by noting that I am listed as a user on Noir, so you can trust me.

I don't know that Noir gets any benefit out of that.

Do you have any chats or anything that would have Mr. Tran giving advice to Noir before January of 2022?

MR. HUNDSCHEID: So no, Your Honor. The chats start at January 26th which we have through a cooperator. We don't -- since we can't search Telegram, we don't have

anything further than that. But I would say Radiant's refund fraud group was also a large group.

THE COURT: But he wasn't charged with that.

MR. HUNDSCHEID: I agree, but I think there's cross promotion.

THE COURT: Okay.

MR. HUNDSCHEID: And so it was mutually beneficial to both of them to advertise them as associated with each other. I think even Mr. Tran has alluded to that. Like, that is why he is linking himself to Noir, and I do not believe Noir is altruistic. I think Occam's razor says --

THE COURT: Of course. I don't either.

MR. HUNDSCHEID: -- the reason that he's doing that is to benefit from him.

THE COURT: Well, I think Mr. Tran would acknowledge that everybody posts each other's names to give all of themselves more credibility. The question is: At what point did Mr. Tran start offering some advice or service to Noir's Organization -- well, if I don't consider just literally having his name on their site as being offense conduct.

MR. HUNDSCHEID: I think that March -- the March 23rd, 2020, message on page 16 where it says, I checked your case, that's more than just --

THE COURT: Yeah. That's the one I keep going back to, Mr. Tran. And you really haven't answered my question on

that one yet.

If -- and we are going back to this (indicating).

THE DEFENDANT: Okay.

THE COURT: If you are not working with Noir or helping Noir with refund fraud, then why are you checking someone's case who reached out to Noir to get a 50 percent refund and didn't get it? Why would that person believe he should go to you? And, more importantly, why did you actually look into it?

THE DEFENDANT: That's a great question. So I would like to bring up the point, again, that I was a -- I was, quote, unquote, "a super-admin" across over 50 Telegram groups, so I basically received scam reports every single day. And I would ban users every single day. It was a very common thing. And that would also be in reference to the federal admin group that I showed previously in the exhibit in which it shows a -- it shows the chat log of just bans and bans and bans.

So in terms of in relation to that chat itself, he reached out to me because I was known to just ban users in general when it comes to handling fraud cases and, like -- scam cases, rather.

And so it did not signify -- it did not signify that I was working with Noir or aiding his service. It is more -- it is more about determining, like, what you just -- what I

should be banning based off of the fulfillment of their service in general. And --

THE COURT: But aren't you helping Noir by checking into the case and then defending Noir by saying that you are five hours too late and thus you are not applicable? It seems like you are doing Noir's work.

THE DEFENDANT: No, I was not defending Noir. I was just basically telling him what Noir said, and I told him to just reach out to Noir to handle that because I was not affiliated with that situation. And that's actually mentioned at the top of the chat log in which I state that I did not know about the situation, and it is rather clear that I was confused by the situation as well.

THE COURT: Where are you finding that at?

THE DEFENDANT: That would be at the top of the chat log itself.

THE COURT: Which exhibit?

THE DEFENDANT: Give me a second. Sorry.

(Brief pause)

THE DEFENDANT: That would be on Exhibit G.

One second. Sorry.

(Brief pause)

(Conferring)

MS. WALLACE: Judge, do you have two copies of the exhibits?

THE COURT: Of the exhibits?

MS. WALLACE: That Mr. Tran --

THE COURT: I have got "I." I have got two "I"s. I have got two Hs. I have only got one G, one F, one E, one D, one C, one A, and one B. So those are the only two I have -- but I don't think that either -- yeah, you can take those, but I don't think that they -- maybe this -- hold on. Here is an A, B -- maybe this one is it. Here's an extra D. Here's an extra C, F, G, and A.

MS. WALLACE: Thank you. Thank you, Judge.

THE COURT: While you look through that, Mr. Tran, I can ask you -- either you or Ms. Wallace. Exhibit D says that you are a super-admin with a dedicated group meant for banning users across 50 groups with a single admin command, which, again, leads me to assume that you are providing a service to Mr. Noir by banning users with a single command. You have been given admin authority, and you can ban users.

Am I misunderstanding your ability to ban users for Noir?

MR. HUNDSCHEID: Your Honor, I do think you are answering the question of what Noir gets out of his relationship with Radiant, right?

THE COURT: Yeah. I mean -- well, that's what I have always assumed that March the 6th of 2020 was is that somebody goes to Radiant to discuss a problem with Noir, and

Noir is checking to see -- I mean, Radiant is checking to see if Noir has done something wrong, the other person has done something wrong. Like, there is a -- there's obviously a relationship between Radiant and all of these others that have given him admin access. He's providing some service.

(Conferring)

THE DEFENDANT: Your Honor, I feel -- I believe I am missing the exhibit for that chat log that references the thing about -- the thing about the person reaching out to me about his case.

THE COURT: Okay.

THE DEFENDANT: But in terms of just answering your question about just banning users, I frequently did this on a daily basis, irrespective of who I had communications with. And it was just purely based off of the fact of whether someone just offered a proper service or not. And I would not actually -- I wouldn't actually need to know whether -- what the service was or not. Just based -- just based off of whether they actually sent money to the person and whether the service was fulfilled, and that was it.

There is no actual relationship between me and Noir based off that fact, and it does not signify that I was actually working for him. Because if he actually banned a user -- I mean, sorry. If he actually took someone's money and did not fulfill a service, I would have actually had to

ban him in the first place.

If you reference -- if you reference back to the chat log itself, what I did was I quoted what Noir had said, and then I told -- I then -- and then I told him just to reach out to Noir directly.

And that's --

THE COURT: But, again, if you checked -- "I checked your case," that means you communicated with Noir about a Noir case, correct?

(Conferring)

THE DEFENDANT: That was about Noir's case, correct.

THE COURT: Okay. And Noir told you that this person messaged him five hours after the 24th so he couldn't get it.

So you are -- this person is reaching out to you as an admin to determine why Noir hasn't worked with him.

THE DEFENDANT: He reached out to me because he was unhappy about Noir's service that he provided, and he felt that he -- he felt that -- he felt that Noir was not providing him proper service. And what I -- what I did was I sent him a message that Noir had sent, and then I forwarded it to him. And I told him that -- I told him to just refer to Noir for it and that I was not affiliated with the situation. That was what the -- that was the situation of that chat log.

THE COURT: But -- and this is the last time I am

going to ask, but why would this person come to you? If this person has a problem with Noir's service, and he says, I wasn't too sure if I should message an admin, but then decides to, why are you the admin that a customer or a user of Noir's service, why are you the person that he comes to?

THE DEFENDANT: Yeah, so I was -- I had a reputation across groups, and I was a known admin. So then I was -- so basically I was the easiest person to come to because I was the most responsive to situations regarding unfulfilled services.

And so because of that, typically people just reach out to me as opposed to someone else. I was just typically the most responsive person on the platform.

And so there were many admins in Noir's groups, and I was just the one that he decided to just reach out to. And I don't believe that he reached out to me off of Noir's group either. He -- at that time, he actually contacted me off of an unrelated group that he knows I was an admin in, and so he just decided to just message me because of that.

THE COURT: But he is still asking you about Noir. He specifically references Noir.

THE DEFENDANT: He does specifically reference Noir in terms of his business agreement with Noir. That's what he was reaching out to me about because of his -- of the lack of fulfillment of his service from Noir.

THE COURT: Okay. And you would have known at that point when you sent that message in March of 2020 that Noir was participating in illegal refund services, correct?

THE DEFENDANT: At that time, I -- I knew that Noir was offering a service, but I did not --

THE COURT: A refund service.

THE DEFENDANT: Yes. I knew that --

THE COURT: Similar to yours.

THE DEFENDANT: At that time, I -- I had knowledge that Noir had a refund service.

THE COURT: For offering refunds.

THE DEFENDANT: Yes, yes. I acknowledge that he was offering a refund service, but I did not know anything beyond that fact in terms of, like, which companies he targeted, nothing --

THE COURT: It doesn't matter which companies. You knew what he was doing, correct?

THE DEFENDANT: I knew what he was doing, but --

THE COURT: And you knew that some company -- you didn't know which one, but you knew or could at least reasonably foresee that some company was going to lose money, correct?

If this refund went through, you knew that a company would lose money, correct?

THE DEFENDANT: If that -- if that refund went

through, I -- it would be to my understanding that money would be lost to that retailer.

THE COURT: Okay. All right. I am going to sustain -- not sustain. I am going to overrule the objection as to loss amount because, again, I am looking at 2B1.1, and actual loss means reasonably foreseeable pecuniary harm that resulted from the offense. And if Mr. Tran is acting as an admin with reasonably foreseeable knowledge that Noir is committing refund fraud and a company could lose money at that moment, then as soon as March of 2020, he knew that it was reasonably foreseeable that companies were losing money based on Noir's activities.

So anything from that point forward would have been reasonably foreseeable. As Mr. Tran just acknowledged, he understood what Mr. Noir was doing, and he -- it would have been reasonably foreseeable to him that Noir was taking money from companies on refund fraud. So I am going to add the 16 there and then move into the sophisticated means.

Ms. Wallace, what is your objection to the sophisticated means addition?

MS. WALLACE: Your Honor, may I also let Mr. Tran address that?

THE COURT: You may.

All right. Mr. Tran, why would you say that what you did -- and it is two separate questions.

Why would you say that what Noir did in general was not sophisticated, and why would you say that what you were offering, particularly when you are discussing or strategizing on how to deal with Apple and other companies, how is that not sophisticated?

THE DEFENDANT: So the sophisticated means that was referenced in the presentence report was about the uses of Telegram itself.

THE COURT: Okay.

THE DEFENDANT: And Telegram is just a general social media platform, and it -- while it does contain privacy features --

THE COURT: Why do people use Telegram as opposed to something else?

THE DEFENDANT: That was something that I have not been really familiar with. It was just that I was Googling, like, ways to make money online, and I found myself on Telegram.

THE COURT: You do understand that Telegram is harder for the government to trace, correct?

THE DEFENDANT: I -- that was not to my knowledge. It was just the fact that I needed -- I needed to find a way to come up with finances at the time to help aid the situation based on the factor of the person being a human trafficking victim. And I needed to rapidly find a way to just come up

with finances. And it was not to my knowledge that Telegram was used for -- was explicitly used because it had any type of, like, perks to -- perks to that. It was just -- it was just, like, a popular social media platform to me, and then I found -- that I found myself having access to, and that was it. It doesn't have --

THE COURT: Can you point to me where in Exhibit C this person tells you to create a Telegram account?

THE DEFENDANT: Could you repeat the question? Sorry.

THE COURT: My understanding of what you are arguing is is this incident, when someone is essentially blackmailing you to save this female individual --

THE DEFENDANT: Yeah.

THE COURT: -- that you created a Telegram account.

THE DEFENDANT: Telegram is not mentioned anywhere in that chat log. It is just that because of the situation, I found myself on Telegram after that fact.

THE COURT: Well, you have got to give me a lot more explanation than that. You just don't find yourself on Telegram. Why did you move to Telegram?

THE DEFENDANT: Yeah, so from -- after that situation happened, I decided I needed to rapidly find finances, so I found myself on Telegram just by Googling ways to make money. And then what I found was that there were

just, like, groups that were advertising, like, marketing services and whatnot. And that's what I initially went off of when it comes to just, like, Google searches. And then once I found myself on the platform, I found these other groups that were on the Telegram platform itself. And so it was not really to my knowledge at all that -- that, you know, people used Telegram for any purposes. It was just, like, there were a lot of groups on Telegram where people can make money off of, and then that's -- that's how I found myself on the platform, and that's how I leveraged it.

THE COURT: Explain to me how refunding works, the way you do it and the distinction between what you did and what Noir did.

THE DEFENDANT: Okay. So in terms of refunding -- so I should make two points clear based off of, like, what I knew at the time.

THE COURT: No. That's not the question. The question is: Explain how it worked.

THE DEFENDANT: Okay. So the way that refunding works is that basically you take -- you take someone's order details, and then you would just get the order information from the account by logging in and then getting -- and then just passing that account -- the label -- passing the label on that account -- like, gaining that label that's associated with the order from that account and just giving it to someone

else for them to handle, and then that's the entire process of the refund.

And then when it comes to -- when it comes to what happens after you -- when it comes to what happens after the label was passed on to another person within Telegram, that is -- that part, I am not really too familiar with in terms of the process itself, just that the label is handed off to the person, and then that's it.

And I believe the second part of the question was how did Noir conduct his refunds; is that correct?

THE COURT: Uh-huh. For example, explain to me how refunding from Apple would work. If you wanted to purchase a product from Apple, how could you get a refund, keep the money and the product?

THE DEFENDANT: So the way to do that would have been to log into the account, get the label, have that label passed on to someone else on Telegram, and then they would do what they would need to do with that label in order to deal with the assurance process, I think. And then from that point on, that's when the refund successfully happens.

THE COURT: Okay. Explain to me in the Anime Fan Club Chat when it says Apple -- this is you talking: Apple has a system in place where if they detect a number of problems from the same number -- I am assuming that's credit card number, or account number?

THE DEFENDANT: Phone number.

THE COURT: Phone number.

THE DEFENDANT: I think.

THE COURT: Apple has a system in place where if they detect a number of problems from the same phone number, et cetera, they would be linked and inclined to fail.

Someone asked you -- Noir asked you, How did you figure it out?

I know that because I tested it across a few months, alternating between numbers.

Explain why you were testing Apple's system for detecting problems across multiple numbers.

THE DEFENDANT: That was actually a statement that I should not have made. I stated that just to, like -- just to be -- just to maintain communication in the group.

THE COURT: No, no, no. Explain to me why you were testing Apple's system of detecting phone numbers across several months, alternating between numbers. Why were you doing it?

THE DEFENDANT: I actually did not perform any tests. What I did was I took an information source from another group and then I passed it on to Noir's Organization group while saying that I did it myself.

THE COURT: You say that you tested using numbers across a few months. Did you actually do that?

THE DEFENDANT: I did not test that myself.

THE COURT: So you were lying?

THE DEFENDANT: I lied in the group in terms of what I did myself. That information was something that was confirmed by another user that I read in another group. And then what I did was I took that information, I mentioned it in Noir's group. And then rather than saying that that person tested it, I said that I tested it.

THE COURT: Where you say on the back of the page, EV works on Samsung, what is EV?

THE DEFENDANT: EV means -- it is, like -- that is the label thing. So, basically, it is known as boxing or something meaning like where a person would -- where a person would send, like, an empty box to a retailer to, like, get the refund. And that's -- to my knowledge, that is what would happen in terms of how the process was handled by another user, and that's what "EV" refers to.

THE COURT: Okay. How do you know this?

THE DEFENDANT: It is just -- it is just very general information in terms of, like, methodology of securing refunds online. And these are -- the two things I had mentioned there in terms of Apple and Samsung were actually information that is considered general information at that time across groups.

THE COURT: I suspect that if you asked anybody in

the room, they wouldn't know that. I don't think it is general information. I think you have to be in the business.

THE DEFENDANT: Well, when I say "general information," what I mean is in terms of the refund space. It was general information in terms of securing a refund. And so -- this was mentioned in some group that these were details that were found in other groups in which I just directed to Noir's Organization.

THE COURT: If you didn't understand how this worked and you are lying to them about your knowledge, then how is it that you have your own website where you are advertising that you can get refunds from Target, Walmart, Zappos, and Macy's? Where did you get your information on how to scam them?

THE DEFENDANT: So when it comes to that information -- as I explained earlier, when it comes to the refund process itself, it is a rather straightforward process in which you just secure account details and then get access to the label, especially with the order, and then that's passed on to someone else on Telegram for them to handle.

And then -- so in terms of -- in terms of the refund process itself, of running the service, itself, it is a very simple process of just logging into the account, gaining a label, and then that's it.

THE COURT: How do you hide the fact that you are defrauding the company from the company? How does Walmart,

Apple, Samsung not know what you are doing?

THE DEFENDANT: That part, I was not too concerned with, and I didn't -- I had no knowledge in terms of how they would know or not. Just -- I was just working off of the information that I had in terms of just making the refund work itself just by logging into an account, gaining a label, and having it passed off to someone else.

THE COURT: If you didn't actually have this knowledge and you were lying to Noir and everybody in the group about the advice you were giving and you were just parroting what you had read somewhere else, then why did you plead guilty and admit in your facts that you provided advice to Noir's Organization about the status of your own fraud project, including marketing insight about how to structure an operation? Is that not true?

THE DEFENDANT: Could you repeat that question?

THE COURT: Yeah. When you came and you pleaded guilty, you acknowledged as part of your plea agreement that you provided advice to Noir's Organization about the status of your own refund project, including marketing insight about how to structure operations. And here, you are offering advice as to what doesn't work for Apple and Samsung.

If you really didn't know how to do all of that and you were lying to them and you didn't understand how your own business worked, then why did you plead guilty? Why did you

admit to me the last time you were here that you were offering advice about how to run a refund project and giving them insight?

THE DEFENDANT: So I believe I should answer your question in two parts in terms of a time line. So when I -- when I ran my refund service, it was back in 2020, around the COVID time, around March. And that chat log in the Anime Fan Club Chat in which I mention work for Apple where I stated that I tested it, that would be found in February 4, 2022.

THE COURT: Okay.

THE DEFENDANT: So the time span is very large. And at that time, my refund service was not operational. It was already closed down.

THE COURT: Okay. That's irrelevant. What is relevant is what you were doing and how you figured it out.

How did you figure out what Apple did and didn't understand and how Apple could or couldn't track phone numbers and shut down accounts?

THE DEFENDANT: So that would be during 2022, and I just read that piece of information from another public access group, and then I diverted that information to Noir's Organization in terms of Apple.

THE COURT: And you lied to Noir and said you personally tested it.

THE DEFENDANT: Yes, that's correct. I lied about

testing it. But nonetheless, that was not a statement that I should have made at all in terms of providing any type of information in terms of Apple at all.

THE COURT: What else have you lied about in these (indicating)?

THE DEFENDANT: That was the only information that I lied about in terms of what I tested or didn't. And then the -- and that was the only -- that was the only thing that I misled the group about.

THE COURT: Okay. So on the Samsung --

THE DEFENDANT: The Samsung thing is based off of public access information that I did read in the groups.

THE COURT: But it says you have to exchange many more emails to push for a refund. How did you know that?

THE DEFENDANT: Yeah, that was actually information that was in groups --

THE COURT: So you didn't do that one either?

THE DEFENDANT: When it comes to Samsung, I did not actually do it myself. It was just information that was found in other groups, and it was public knowledge in the refund sphere in terms of what worked for Samsung because when it comes to empty-box methods, this is actually a very general thing that was known in the refund space when it comes to how the labels and stuff were handled.

And then so, like, once the label process is -- once

the label is retrieved and passed on to another person, that would be known as, like, the boxing method which they used in order to secure the refund. But in terms of -- in terms of the process of actually doing that, it would just be based off of just gaining the label itself.

THE COURT: How did you accept money when you were in the refund business?

THE DEFENDANT: When I was -- back in 2020, the way that I took the money was through -- it was through Cash App.

THE COURT: Okay. What did you do with the money once it came in?

THE DEFENDANT: Once the money came in, because I was helping -- because I was under the belief that I was helping a human-trafficking victim, what I did was I sent money to her bank account.

THE COURT: Okay. All right. Any other argument as to why what you were doing wasn't sophisticated?

THE DEFENDANT: So the platform of Telegram itself carries privacy features that is actually commonplace across social media platforms in terms of just, like -- in terms of just, like, keeping chats private or deleting messages. It is a very common thing, so it was not really -- when it comes to using Telegram, it is not an actual sophisticated means of concealing information.

THE COURT: When did you learn -- when did you learn

this, about how Telegram keeps things confidential?

THE DEFENDANT: So the way that Telegram works is that you can delete messages and it just keeps them private because you can delete messages.

THE COURT: When did you learn that?

THE DEFENDANT: Upon just using Telegram.

THE COURT: From the beginning?

THE DEFENDANT: Yes, from the beginning. And --

THE COURT: So all the way back in 2020?

THE DEFENDANT: I wouldn't -- 2020 --

THE COURT: You are using Telegram all the way back in 2020.

THE DEFENDANT: I was using Telegram back in 2020. During the initial start period, I was not using it for anything fraudulently related, just for building persona.

THE COURT: But you understood as far back as 2020 --

THE DEFENDANT: I did understand --

THE COURT: -- that Telegram could be used to delete messages?

THE DEFENDANT: Yes. I understood that it could be used to delete messages just like any other social media platform.

THE COURT: All right. I am going to overrule the objection on sophisticated means for two reasons. First of

all, that particular guideline is disjunctive, and there's two different reasons that I find that Mr. Tran fits within the sophisticated means. The first one is (10)(B) says that a substantial part of the scheme was committed from outside of the United States.

It is undisputed and the PSR says that Noir's Organization had members all over the world. Mr. Tran and Noir don't even live in the same country. Noir is located and runs Noir from Egypt. So regardless of whether Telegram is sophisticated or not, the scheme that was run by Noir was sophisticated under (10)(B) because it was an international scheme with members all over the world, including its leader.

Even if that isn't a correct reading of the guideline, and I think it is, (10)(C) is appropriate because the conspirators used sophisticated means to execute and conceal the offense. The Eleventh Circuit has said that I do look at the scheme as a whole, not just the individual's conduct, at least previously, but I am going to do both today.

The application notes give examples. One is locating a main office in one jurisdiction with operators in another.

Again, the main office for Noir was in Egypt. Operators were all over the world. The evidence shows at least 8,000 people. Many of them were here in America, including Mr. Tran himself. So under Application Note 9's

first example, he would fit within "otherwise sophisticated."

The second example is hiding assets or transactions. I am not going to find that one because I don't find that Mr. Tran was personally taking money or transactions on behalf of Noir, but I do find that there are other sophisticated means that would help conceal.

Use of proxy server and VPNs, again, Mr. Tran is saying that he didn't know -- when he first started talking, he was saying he didn't know that Telegram was used to do things privately. But there at the end of our conversation, he said he has known from the beginning that Telegram operates in a way that you can delete things and make it private and not traceable. He just said that's a form of software. But that's not what the guideline is talking about.

It is talking primarily about using means that allows the defendant to avoid detection or conceal what he or she is doing from the government. And Mr. Tran acknowledges that you can use Telegram to delete messages and thus make it easier to hide things from the government.

So even all else being the same, just the use of Telegram alone, I would find a violation or at least the enhancement under (10)(C) is appropriate. Again, I agree that Mr. Tran didn't do a lot of the things that others did. He didn't create malware. He didn't pay off insiders by calling them. He didn't create virtual credit cards, but he did act

on a private system to communicate directly with the leader of Noir's Organization, and he did know that organization was spread all over the world. So I believe that under (10)(B) and (10)(C), the two-level sophisticated means enhancement is appropriate, so I am going to add it.

Ms. Wallace, any disagreement with my application of ten-plus victims, assuming that my finding of date range is correct? Obviously, if I am wrong on that, that may be different, but there were certainly more than ten victims during the time frame of March 2020 through the summer of 2022.

MS. WALLACE: Your Honor, Mr. Tran is still wanting to explain to you that he did not use any VPNs.

THE COURT: I didn't find that he used VPNs. I find that others used VPNs to mask their IP addresses.

Mr. Hundscheid, do you have any evidence that Mr. Tran personally used VPNs?

MR. HUNDSCHEID: I would have to go back and look at the IP logs, Your Honor, so I don't want to speculate off the top of my head.

THE COURT: Do you have evidence that Mr. Tran used Telegram?

MR. HUNDSCHEID: Yes, Your Honor.

THE COURT: Do you have evidence that it is difficult, if not impossible, for the government to recover

deleted messages off of Telegram?

MR. HUNDSCHEID: Yes, Your Honor, particularly at the time that this offense conduct occurred.

THE COURT: Do you also have evidence that Noir's Organization was international in scope, headquartered in Egypt or somewhere in another country other than the United States and it had members across the United States?

MR. HUNDSCHEID: Yes, Your Honor.

THE COURT: All right. So I still find the two-level enhancement is applicable.

MS. WALLACE: And, Your Honor, I know you were asking about the ten or more victims. It would be Mr. Tran's position that there were not ten victims that he offered any advice on because I know that there was Apple and Samsung, but I can let Mr. Tran more fully --

THE COURT: Yeah, if you want to do that, that's fine. Go ahead.

THE DEFENDANT: So when it comes to my -- so when it comes to my communication with Noir, I never actually talked about any types of, like, refund methodology besides Apple and Samsung.

THE COURT: Okay.

THE DEFENDANT: And those are the only two retailers that I did speak to him about.

In terms of his refund service itself, I did not

actually pay any attention to, like, the companies that he targeted because I was not an operator, and it was just not details that I paid attention to because I -- I just -- I had no affiliation with Noir in terms of his business. I did not take any payments from it either at all. So I was not working for him. So I had no -- there was no necessary -- it was not necessary for me to actually know the full scope of, like, who he targeted in terms of, like, retailers at all.

THE COURT: But you told me earlier that you understood he was targeting retailers. You might not know which ones, but you knew what he was doing.

THE DEFENDANT: I knew what he was doing in general but not the retailers that he targeted.

THE COURT: But you would reasonably foresee he was targeting more than ten companies.

THE DEFENDANT: In terms of which retailers he --

THE COURT: I am not asking for specific names or identities.

THE DEFENDANT: Okay.

THE COURT: You knew that he was -- he was targeting more than ten companies. I mean, you personally had four or five on your own web page.

THE DEFENDANT: I did not know that he was targeting more than ten companies, no, because that is actually a very high number in terms of a refund service. It is typically --

it was typically better to just have -- just a focus on a few of them rather than just, like, a lot of them.

THE COURT: All right. I am still going to apply the ten-plus because, if you read it plainly, it applies if the offense involved ten or more victims. It doesn't say if Mr. Tran personally involved ten or more victims. It just says the offense involved ten or more victims, and the offense here is the conspiracy to commit refund fraud. And there is more than sufficient evidence in the record that the conspiracy among the Noir members involved ten or more victims.

I also find that it is reasonably foreseeable that a group as large as Noir with 8,000 members across the world would have at least ten companies that it was targeting, so I am going to add the two points there.

I am going to remove two points for zero-point offender. I find that Mr. Tran has no criminal history that results in points. I am also going to remove two points for acceptance of responsibility and an additional point for assisting the government as he accepted responsibility, which added together would be 7 plus 16 is 23 plus 2 is 25 plus 2 is 27 minus 2 is 25 minus 3 is 22.

Mr. Hundscheid, do you agree with that math?

MR. HUNDSCHEID: Yes, Your Honor.

THE COURT: Ms. Wallace, I understand what your

objections are, but objections aside, do you agree that my math is correct?

MS. WALLACE: Yes, Your Honor.

THE COURT: All right. Having overruled the objections but allowing them to be argued on appeal if Mr. Tran is allowed to appeal, I do adopt the factual statements contained in the presentence report. I make specific findings the guideline offense level is 22, the criminal history category is I. That makes the guideline prison range 41 to 51 months, supervised release period is not more than three years, and the fine range is 15,000 to 150,000 with restitution and forfeiture not being an issue.

At this time, Mr. Hundscheid, would you like to make a motion?

MR. HUNDSCHEID: Yes, Your Honor. For the reasons already stated on the record earlier in our conversation, the government would move under 5K1.1 to sentence Mr. Tram below the guidelines, specifically to depart from offense level 22 to offense level 16 which yields a new guideline range of 21 to 27 months.

THE COURT: Any objection, Ms. Wallace?

MS. WALLACE: No objection.

THE COURT: Mr. Hundscheid, same questions: Do you find that the information that Mr. Tran provided was truthful?

MR. HUNDSCHEID: Yes.

THE COURT: Mr. Jones, I need you to step out just for a second because I do need to get into some specifics.

(Courtroom cleared)

THE COURT: Do you find the information that he gave was reliable?

MR. HUNDSCHEID: Yes, Your Honor.

THE COURT: Please again describe the assistance of that information that Mr. Tran gave, particularly towards the indictment of Noir himself.

MR. HUNDSCHEID: Yes, Your Honor. At the time that the indictment was returned against Mr. Tran and the other conspirators, I would say that the Noir identification had hit a roadblock and a dead-end. All the leads had been exhausted.

Mr. Tran met with the government on multiple occasions and specifically provided two facilities that he had personally interacted with Noir on, and further process from those two facilities led to the ultimate identification and indictment of Noir.

THE COURT: Very good.

All right. I am going to grant the government's motion for a downward departure. I do find that Mr. Tran's assistance was substantial and useful. I find that the information he provided was truthful. It was reliable. It did assist the government in ultimately securing an indictment of the leader of the Noir Organization, and I do not hold it

against Mr. Tran that that has not been able to be prosecuted. That is obviously outside his control. And I do find that his assistance was timely. I am, therefore, going to grant the full six levels because, again, his assistance, above all -- I think above all of the defendants -- is the one that was able to lead to the indictment and uncovering of the identification of Noir, and, therefore, he is entitled to the greatest level reduction that I have given any of the codefendants. I think I have only given it to two. He is one, and there is another for reasons I will not get into at this time.

I find that after taking six levels off for the downward departure, the appropriate level is 16. And when you combine that with a criminal history category of I, the advisory guideline range drops to 21 to 27 months, fine range of 10,000 to 95,000, and supervised release is not more than three years.

All right. Ms. Wallace, the guideline range is now 21 to 27. I have read everything that you have submitted, but certainly if you would like to make any argument at this time, highlight any evidence, or provide any statements from any witnesses -- and then ultimately, of course, we will let Mr. Tran speak as well -- you may do so at this time.

MS. WALLACE: Your Honor, I believe all the statements we have have been submitted to the Court previously.

THE COURT: Okay.

MS. WALLACE: And I would just ask, Your Honor, that in sentencing you take into account the physical problems that I know you are aware of through the presentence report of Mr. Tran and place him accordingly if the Court is inclined to.

THE COURT: How would you like me to word that?

Do you want to go off the record for a second?

MS. WALLACE: That would probably be better, Your Honor.

THE COURT: All right. Let's go white noise, Ana.

(Sidebar discussion off the record)

THE COURT: All right. Mr. Tran, is there anything you would like to say at this time?

THE DEFENDANT: Yeah, I would like to say that -- so I -- I understand I made a mistake by affiliating myself with the wrong environment, and it was -- this has been the biggest mistake of my life, and I did not intend for things to turn out this way.

At the time, I generally felt that I was helping someone's life, and it is not -- it wasn't a situation where it was easy to say whether I was doing the right thing or not in terms of fulfilling that purpose; but nonetheless, it was a decision that I did make in terms of affiliating myself with the wrong environment, and that's exactly what I did. I have

said things I should not have, and I have -- and I have affiliated myself -- I affiliated myself with Noir and his organization when I -- when it was the complete wrong thing to do, and this has all been a situation to completely learn from and to never make the same mistake again.

And my family has fully supported me through all of this, and it is not something that I will ever repeat again. I will not allow myself to dishonor my family and to also dishonor my brother for coming here today and being there for me. And while I understand that I made mistakes, this is something that I will definitely learn from and to grow and surpass in terms of my personal life, and I just -- would just like a chance to just be -- just remain around my family and to better myself and to be a positive force for my family and the community around me.

Thank you.

THE COURT: Very good. Thank you, Mr. Tran.

Mr. Hundscheid.

MR. HUNDSCHEID: Your Honor, when -- I have had the opportunity, as you know, to meet with Mr. Tran on a couple of occasions. And in those meetings, I asked him to help me be his advocate because as the Court alluded to, there are reasons that I would want to do that. And I am grateful to him for that.

My concern, Your Honor, is that I hear a lot of

passive voice and "finding myself in situations," and I am concerned that there is no recognition of his own involvement in this. As I think was established through the Court's colloquy with Mr. Tran, his involvement is qualitatively different than other defendants, but in some ways, it is much more severe, right? If you are a super-administrator of these groups, if you are citing Noir and AIO Crime as groups that you are administrators of, that suggests your role in Noir might have been different and less involved, but your role in the fraud ecosystem is substantially bigger.

So, Your Honor, the government is going to recommend the low end of the guidelines because I believe that's sufficient but not greater than necessary in this case, the 21 months. But honestly, it is just a difficult -- a difficult decision in weighing those two dynamics.

THE COURT: Very good. Ms. Wallace, you get the last word, if anything you want to add.

MS. WALLACE: Your Honor, we would definitely ask for the low end, but Mr. Tran would like to respond to Mr. Hundscheid.

THE COURT: He may.

Go ahead, Mr. Tran.

THE DEFENDANT: I would like to clarify that my -- that my involvement with Telegram at all was because of my external factor of helping a human-trafficking victim

supposedly, and that's exactly what I did to put myself in the wrong situation.

THE COURT: Did you know -- did you know that a group called AIO Crime was committing crimes?

THE DEFENDANT: It was -- for me, it was just a general chat avenue; and while there were criminals in there, what I did, in my involvement --

THE COURT: What made them criminal?

THE DEFENDANT: I don't really necessarily know what they did to --

THE COURT: Well, you just said there were criminals in there. What did AIO Crime do that was criminal?

THE DEFENDANT: Well, just based off of their conversation in general.

THE COURT: Like what? What was the conversation about?

THE DEFENDANT: Just refunds and stuff.

THE COURT: And you knew that refunds were criminal.

THE DEFENDANT: I do know that refunding is a criminal activity, that's correct.

THE COURT: And you knew that's what Noir was doing?

THE DEFENDANT: I did know that that was what Noir was doing in terms of his organization. But in terms of my involvement in these group chats, what I did was I had casual conversations in terms of, like, current events and stuff just

to build up a persona for people to recognize me. And that was -- that was the limit of my involvement in these group chats, and I have full recognition that I should not be there or affiliated in these -- in these -- in these groups or, like -- or put myself in any sort of affiliation with fraud in the first place. That is the wrong thing to do, it is unlawful, and just completely wrong.

THE COURT: Okay. Thank you.

All right. Although I have the authority to depart or vary from the application of the guidelines, I don't find a reason to here.

I will be blunt, Mr. Tran, as to what Mr. Hundscheid was trying to say. You are the fourth defendant I have had today, and the other three came in here and just very bluntly said, What I did was a crime. I admit I did it. I knew I did it.

And no matter what question I asked you, you always tried to find a way to minimize or say that what you were doing wasn't a crime. I mean, I have got direct statements from you -- hold on -- that Apple has a system in place that if they detect a number of problems from the same number, they would be linked and inclined to fail.

How did you figure that out?

I know because I tested it across a few months, alternating between numbers.

And you come in here, Oh, I was lying. And then you do this with Samsung, and you tell me that you are lying and that you are running a refund fraud service but you don't really know that other refund frauders are committing crimes.

At no point in the two times I have had you have you just been able to just stand up and bluntly say: I knew what I was doing was criminal. I knew what Noir was doing was criminal. These were crimes, and I was helping him think about how to better commit crimes.

Instead, you have come up with excuses and statements that I wasn't really committing a crime. I was lying or puffing myself up because I was in a group chat.

Why can't you just bluntly say that in 2020, I was committing crimes, and I knew Noir was committing crimes. And I was helping him commit crimes. And when I was telling him what Apple had understood and what Samsung understood, I was able to tell him that because I was still doing it, and I was giving him advice on how to do it better.

THE DEFENDANT: May I respond?

THE COURT: You may.

THE DEFENDANT: So in 2020 -- around the beginning of March of 2020, it was certainly the case that I was doing refunds myself because I ran a refund service. There is no denying that.

And in terms of my relationship to Noir, I was

trying to explain how the chat logs went, but I have -- I have full recognition that I should not be saying anything related to that, especially because I had my own refund service; and therefore, I -- there was no reason for me to be in Noir's groups in the first place. And despite the fact that I was dropped into these groups and despite the fact that I could not properly leave, I still should not have engaged at all. And I have full recognition of this.

THE COURT: I don't understand why you couldn't leave. If you know the Noir Organization is an international crime organization and you know what they are doing is criminal, why can't you just literally delete your Telegram account or not respond when they are asking for your advice. Who forced you to stay? This was two years later.

THE DEFENDANT: So in terms of the way that -- so this would be based off of my dynamic with Noir himself; and because we had a more personal relationship, he thought it was just fun to just drop me in the groups repeatedly. And so as shown in the previous exhibit, he just did it for fun and just to irritate me. And so at some point, it was just -- it was just not -- it was just -- there was just no point of actually physically -- or not physically -- just, like, there was just no point of leaving the group itself because he would just add me back.

THE COURT: He was annoying you, and you continued

on? I don't understand why you would do that.

THE DEFENDANT: Yeah, it was just part of Noir's crux as his personality. He would just do things for fun because we had a personal relationship that was based off of actual friendship.

THE COURT: Why would you lie about knowing how Apple detects problems and say that you tested it across a few months? If you didn't like being involved in the group chat at all, why would you come up with a lie to help them better understand how to deal with Apple?

THE DEFENDANT: Yeah, that was a -- very poor decision-making on my part.

THE COURT: Why would you do it, though?

THE DEFENDANT: In terms of -- in terms of why I did it, it was just to, like, remain in the group, just to --

THE COURT: But you just told me you didn't want to be in the group.

THE DEFENDANT: I did not want to be in the group. However, at that time, I thought it was best to observe what else they would say while not having any affiliation with them. And as mentioned already, I completely understand that this was the wrong thing to do. I should not be putting myself in any type of situation related to fraud or anything that's related to breaking the law in general. I understand this completely, and I understand completely that I was doing

the wrong thing.

THE COURT: Okay. All right. For the same reasons, I find that the low end of the guideline is appropriate. Again, that is what the bargain between Mr. Tran and the government was, and I will respect that.

Also, this reflects, again, the most significant discount I have given anybody, not only in this case but in any of my cases, in going down six levels out of respect for Mr. Tran's assistance to the government and helping determine who Mr. Noir ultimately was and leading to his indictment.

So I do find that a sentence of 21 months is appropriate having considered the guideline computations and the factors found at 18 U.S.C. 3553(a).

I am going to recommend that the bureau sit down with Mr. Tran, let him go through a medical assessment, and determine where the best placement for him is. I find that Mr. Tran could be susceptible -- I am just worried about his placement within the Bureau, and I know that Ms. Wallace has expressed that as well. And I want them, between the time of now and when he's ultimately placed and turns himself in, for them to strongly consider where the best, for health and protection reasons, location for him is.

For that reason, Mr. Tran, I am not going to make you turn yourself in today. I am going to -- I am going to set it off at least two months for the Bureau to make that

determination.

I find that this sentence, again, is reasonable in light of the factors under 3553(a).

I am not going to impose a fine because I find Mr. Tran could not pay it at the present time. There is no restitution, no forfeiture, but I am going to order a $100 special fee. It is mandatory by statute, and it must be paid immediately.

Upon your release from prison, you will be placed on supervised release for three years. While you are on supervised release, you will comply with the standard conditions of release of record in this court and the following special conditions.

You will cooperate in the collection of DNA evidence under the administrative supervision of your probation officer, and you will participate in a mental health treatment program under the administrative supervision of your probation officer and follow any rules and requirements of the program.

You will contribute to the cost of any treatments given to you by probation unless they determine that you cannot pay for it.

I will not impose the computer monitoring program, Mr. Tran. That means that once you are done with your prison sentence, I am not going to have probation or the government monitor your computer, but that's with the understanding that

if you go back to committing online fraud or any type of fraud using a computer or phone, that would result in the immediate revocation of your release and your return to incarceration, understood?

THE DEFENDANT: Yes.

THE COURT: Okay. In imposing this length of supervised release and considering the factors found at 18 U.S.C. 3583(c) and 3553(a), I find that it is reasonable under those factors.

Mr. Hundscheid, any objection as to my findings of fact, the calculation of the guideline range, the sentence I imposed or the manner in which I imposed it?

MR. HUNDSCHEID: No, Your Honor.

THE COURT: Ms. Wallace, other than the objections to the calculation of the offense level that we have already gone over, any objection to anything that we have done today?

MS. WALLACE: No, Your Honor.

THE COURT: All right. Mr. Tran, you do have the right to appeal this sentence within 14 days if you think it violates the law. You may have waived that right as part of your plea agreement. Generally, our circuit does enforce those waivers. In other words, typically, they could say you can't appeal because of the waiver. That said, you can always make an argument to them why they shouldn't enforce it and why they should allow your appeal. The most important thing is if

you do want to appeal, do it within 14 days because if you miss that 14-day window, you have waived your right to appeal.

Understand?

THE DEFENDANT: I understand.

THE COURT: All right. So if you can't pay the cost of appeal but want to, you can apply to appeal in forma pauperis and ask that Court to give you an attorney. If they do that, they can -- you can then ask them to prepare and file your notice.

Now, as for a turn-in date, like I said, I am going to set it off until Monday, June the 8th. That's just a little under two months from now, and that will be at noon local time.

Again, the Bureau will work with you to determine where the appropriate location is. You will not have to come back here. It will be wherever they tell you.

Ms. Wallace, if Mr. Tran has any issues between now and then that warrants a different date or the Bureau lets me know that it needs to change, I will obviously do whatever I can to make that transition easier.

Understood?

MS. WALLACE: Yes, Your Honor. Thank you.

THE COURT: All right. Anything else from Mr. Tran today?

Anything else?

THE DEFENDANT: I don't really have anything else to add other than the fact that I -- I certainly did accept responsibility in this case, and that's something that I did try to communicate. I am not the most verbal person, and I am a bit antisocial, and my communication with you is a bit limited in that aspect. But I did my best to communicate the fact that I did accept responsibility, and I do know with full knowledge that I did the wrong things, and these are mistakes that I am not going to ever repeat again.

THE COURT: Thank you, Mr. Tran. I don't hold your ability to communicate against you. In fact, as far as being prepared as a defendant to argue your case, you are probably top ten percent of anybody I have had. You communicate very well.

And, again, the sentence you have gotten is at the bottom end of a very low guideline because of the assistance you have given the government. So, you know, it is not like I am holding anything against you. My comment was -- and I think Mr. Hundscheid shares it -- is there's just never been a full-throated: I acknowledge that I was committing crimes personally, and I acknowledge that I was helping Noir commit crimes. And I knew that's what was going on.

It has always been a deflection or a "I was lying" or "I didn't want to be part of the group." It has never just been looking at me and saying, Your Honor, I admit I was a

criminal, I admit Noir was a criminal, and I admit that I was helping him be a criminal.

That is my point.

THE DEFENDANT: May respond to this?

THE COURT: You may.

THE DEFENDANT: Yes. So when it comes to my own refund service, it is undeniable that I participated in criminal activity. There's no denying that. And the way that I was trying to explain my relationship with Noir, it has always been a rather particular relationship that I had with him, and that's why the details are a bit nuanced and hard to really fully explain in detail.

But in terms of -- in terms of me saying that I lied when it comes to the Apple methodology, it is not a case that I did lie because I sourced that information from other groups. And it is -- I have full knowledge that this was something that I should not have done at all --

THE COURT: Mr. Tran, I am going read for you word for word what you said. "I know this because I have tested it across a few months, alternating between numbers."

"I tested it." It is not others tested it, posted it on a forum --

THE DEFENDANT: Yes.

THE COURT: -- I read it, and I am telling you what they said. You said, "I tested it across a few months,

alternating between numbers." You specifically said: I was the one doing it; this is how I get personal knowledge.

THE DEFENDANT: Yes.

THE COURT: So that's not me misreading it. That is -- that is what you said.

THE DEFENDANT: You did not misread it. It was something that I did say by taking information from other groups and misappropriating it to Noir's group.

THE COURT: Okay.

THE DEFENDANT: Because I was an admin of many groups, it was just the case I had access to many groups, so it was easy for me to source information from just -- just in general. And so I misappropriated that to myself when I should not have, and the very fact that I said it at all was a complete wrongdoing. I should not have been in the group at all, and I have full recognition that I should have left. I did try, but I was added back. And the reason why I did not leave Telegram, itself, is because I was just focused on my stock channel.

After the fact that -- after the fact that I found out I was being lied to, that's when I ended my refund service, and that's when I focused on my stock group. And that's why I remained on Telegram, itself, despite having no affiliation to actually conducting fraud myself.

THE COURT: Okay.

All right. Ms. Wallace, anything else?

MS. WALLACE: No, Your Honor. Thank you.

THE COURT: All right. We are adjourned. Thank you.

(Proceedings adjourned at 3:44 p.m.)

C E R T I F I C A T E

I certify that the foregoing is a correct transcript to the best of my ability from the record of proceedings in the above-entitled matter.

So certified on this date, April 30, 2026.

Carrie M. Robinson, RMR, CRR, CRI
Federal Official Court Reporter